AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❏ Original



CLERK'S OFFICE
A TRUE COPY
Feb 22, 2024
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
Electronic device, currently located at 11548 Theo
Trecker Way, West Allis, Wisconsin 53214, more fully
described in Attachment A

)
)
)
)
)
)

Case No. **24-M-345 (SCD)**

**Matter No.: 2024R00007**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search and seizure
of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B

        **YOU ARE COMMANDED** to execute this warrant on or before    3-7-24
        _____ *(not to exceed 14 days)*
   ❏ in the daytime 6:00 a.m. to 10:00 p.m.    X at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____ .
                                                            *(United States Magistrate Judge)*

   ❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
   ❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:    2-22-24. 10:00 am
                         _____

                                              *Stephen C. Dries*
                                              _____
                                              *Judge's signature*

City and state:   Milwaukee, Wisconsin            Hon. Stephen C. Dries, U.S. Magistrate Judge
                  _____          _____
                                                  *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

The property to be searched, identified as "**TARGET CELLPHONE**," is described as follows: a black Samsung smartphone with a blue protective case and assigned International Mobile Equipment Identity (IMEI) number 351980931002883. (see images of device below)







The **TARGET CELLPHONE** is currently located at 11548 Theo Trecker Way, West Allis, WI 53214. This warrant authorizes the forensic examination of the **TARGET**

29

**TELEPHONE** for the purpose of identifying the electronically stored information described in

Attachment B.

**ATTACHMENT B**

1.      All records on the **TARGET CELLPHONE** described in Attachment A that relate to violations of Title 21, United States Code, Sections 963, 959(a), and 960(b)(1)(B) (international drug-trafficking conspiracy); Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A) (conspiracy to possess with intent to distribute controlled substances); and Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A) (money-laundering conspiracy), including, but not limited to:

    a.   contact lists;

    b.   any information regarding schedules or travel;

    c.   all bank records, checks, credit card bills, account information, and other financial records;

    d.   photographs and/or video depicting Efrain HERNANDEZ-LAUREL and/or others who may have engaged in violations of the above-referenced offenses;

    e.   electronic telephone books, address books, telephone bills, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications (e.g., text messages, iMessages, etc.) regarding violations of the above-referenced offenses among and between Efrain HERNANDEZ-LAUREL and/or others who may have engaged in violations of the above-referenced offenses; and

    f.   records of Internet Protocol (IP) addresses used; records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or

31

"favorite" web pages, search terms that the user entered into any internet search engine, and records of user typed web addresses.

2.    Evidence of user attribution showing who used or owned the **TARGET CELLPHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

32



CLERK'S OFFICE
A TRUE COPY
Feb 22, 2024
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| Electronic device, currently located at 11548 Theo Trecker Way, West Allis, Wisconsin 53214, more fully described in Attachment A | ) |

Case No. **24-M-345 (SCD)**

**Matter No.: 2024R00007**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 963, 21 U.S.C. § 846, & 18 U.S.C. § 1956(h) | International drug-trafficking conspiracy, conspiracy to possess with intent to distribute controlled substances, and conspiracy to launder monetary instruments |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JEREMY S DORN
Digitally signed by JEREMY S DORN
Date: 2024.02.21 11:45:01 -06'00'

*Applicant's signature*

SA Jeremy Dorn, HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date: 2-22-24

*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

**MATTER NO.: 2024R00007**

I, Jeremy Dorn, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property— electronic

devices—which are currently in law enforcement possession, and the extraction from that property

of electronically stored information described in Attachment B.

2.      I am a Special Agent of the United States Department of Homeland Security,

Homeland Security Investigations/U.S. Immigration and Customs Enforcement (HSI/ICE),

assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin.  As such, I am an

"investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and 21

U.S.C. § 878, an officer of the United States who is empowered by law to conduct investigations

of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am also a Task Force

Officer (TFO) with the United States Department of Justice, Drug Enforcement Administration,

currently assigned to DEA Group 63, at the North Central High Intensity Drug Trafficking Area

(HIDTA).  I have been a federal law enforcement agent for over ten years.  I have received basic

criminal investigative training, including thirty-six weeks at the Federal Law Enforcement

Training Center (FLETC).  In the course of my work, I have become knowledgeable with the

enforcement of federal laws pertaining to narcotics and dangerous drugs. I have participated in

drug-trafficking investigations conducted by HSI/ICE, the Drug Enforcement Administration

(DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other

1

law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. I am currently a member of the North Central HIDTA Task Force assigned to the opioid initiative as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances.

3.     I am familiar with various methods of smuggling and trafficking controlled substances and their proceeds. I am also familiar with methods used to by traffickers to evade detection of both the controlled substances and its' proceeds. I have received training in the investigation of and am knowledgeable in investigations pertaining to drug trafficking, illegal firearm possession and trafficking, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.

4.     I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal search warrants for narcotic related offenses, which have resulted in the seizure of controlled substances, firearms, United States currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

5.     I have extensive training and experience in the investigation of Drug Trafficking Organizations (DTO). I am familiar with the different structures, the motivations for criminal their activities, the hierarchies, and the variety of roles of the members within the organizations. I have applied my training in the investigation of these organizations and have charted and tracked them. My investigations have revealed the geographical locations that they inhabit, the level of violence and

2

crimes they have committed and their hierarchy and the roles of their members within their respective organizations. I have participated in these types of investigations as both the lead investigator and co-agent and have successfully dismantled them by use of several law enforcement investigation techniques to include wiretaps.

6.      In addition, through training, experience, and discussions with other experienced agents:

    a.  I have learned about the manner in which individuals and organizations distribute controlled substances;

    b.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

    c.  I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

    d.  I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

    e.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

    f.  I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

    g.  I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial

3

instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.  I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages, and outbuildings), businesses or other locations over which they maintain dominion and control;

j.  I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l.  I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m.  I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs in their possession;

4

n.  I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target.  The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money.  When an informant is used, he/she is searched for contraband, weapons, and money before the operation.  The informant is also wired with a concealed body recorder and monitoring device.  When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents.  The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded; and

o.  During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7.  I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this affidavit are based on my knowledge and, in part, information provided by law enforcement officers (LEOs), including (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other LEOs about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking investigators; (d) physical surveillance by the DEA, Homeland Security Investigations (HSI), and local law enforcement agencies, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) information provided by confidential sources working for the DEA, HSI, and North Central HIDTA; (h) consensually-recorded phone calls between confidential sources, undercover agents that involved the TARGET TELEPHONES; (i) controlled

5

purchases of heroin, fentanyl, and cocaine; (j) review of driver's license and automobile registration records; (k) records obtained from law enforcement databases; (l) my training and experience as a DEA TFO; and (m) the training and experience of other LEOs involved in this investigation; (n) United States Postal service records; (o) and wire and electronic communication interceptions that have been translated from Spanish to English.

8.      Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause of violations of Title 21, United States Code, Sections 963, 959(a), and 960(b)(1)(B) (international drug-trafficking conspiracy); Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A) (conspiracy to possess with intent to distribute controlled substances); and Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A).  The property to be searched is described as follows, and in Attachment A: a black Samsung smartphone with a blue protective case and assigned International Mobile Equipment Identity (IMEI) number 351980931002883, hereinafter the "**TARGET CELLPHONE**."

9.      The "**TARGET CELLPHONE**" is currently located at 11548 Theo Trecker Way, West Allis, WI 53214.  The **TARGET CELLPHONE** was originally seized incident to Efrain HERNANDEZ-LAUREL's arrest by state authorities in Fayette County, Texas on December 14, 2023.  Your affiant believes there is probable cause to search the **TARGET CELLPHONE** for evidence relating to a violation of Title 21, United States Code, Sections 963, 959(a), and 960(b)(1)(B) (international drug-trafficking conspiracy); Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A) (conspiracy to possess with intent to distribute controlled substances); and Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A).

6

10.     The applied-for warrant would authorize the forensic examination of the **TARGET CELLPHONE** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11.     Between October 27, 2020 and August 26, 2021, a confidential source, who was working with North Central HIDTA investigators, conducted eight controlled purchases of heroin from a Chicago-based distributor named Rene Suarez, including several transactions that occurred in the Eastern District of Wisconsin.   With respect to each transaction, Suarez supplied approximately 100 grams of heroin.  In June 2021, investigators commenced intercepting the wire communications of Suarez.   Based on these intercepts, investigators determined that Manuel Reyes-Soto was a heroin and cocaine source for Suarez.  Reyes-Soto lived in Mishawaka, Indiana. Investigators subsequently obtained authorization to intercept Reyes-Soto's wire communications as well.

12.     The intercepted communications disclosed that Reyes-Soto would receive bulk quantities of drugs from sources in Mexico.  For instance, on June 29, 2021, Reyes-Soto told Suarez that a cocaine source "delivered twenty-five," and continued, "[t]hose ones are ours," indicating the cocaine was intended for Reyes-Soto and Suarez.   Reyes-Soto then said, "[t]he deadline will not start from when it leaves Mexico; it will start from the moment it arrives to me." He continued, "So once I get my twenty-five, I'll have a month to do . . . well, to work with them." Reyes-Soto had thus indicated that he would be fronted cocaine from a source in Mexico and would have a month from the moment he received the cocaine to pay the source.   In other intercepted communications, Reyes-Soto discussed prevailing cocaine prices.  For instance, on June 30, 2021, Reyes-Soto told Suarez, "that's why I'm going to tell that dude that they need to

7

give it for 30, so I can give it for 32-500."  Reyes-Soto also remarked, "They are telling me that in Mexico, in Monterrey it's 17-500."  The price of a kilogram of cocaine in the interior of Mexico, such as Monterrey, is approximately $17,500, and in urban areas in the upper Midwest, such as Chicago or Milwaukee, the price is approximately $30,000 - $32,500.  Reyes-Soto received his drugs from Mexico via tractor trailer.  Reyes-Soto would send the drug proceeds to his Mexican sources via tractor trailer as well.

13.     On November 30, 2021, investigators arrested Reyes-Soto at his residence in Mishawaka, Indiana.  On the same date, the investigators also executed a warrant to search his residence.  Reyes-Soto's spouse indicated Reyes-Soto had a firearm.  During the search, investigators recovered numerous cellular devices, 2 scales, documents, and two firearms. Both firearms, which were a Sig-Sauer 9 mm semi-automatic pistol and a Taurus .25 caliber semi-automatic pistol, were found in Reyes-Soto's bedroom closet.  Investigators also found a box of fifty (50) .25 caliber bullets.

*Identification of "Lacho" and "Neke" as cocaine sources*

14.     Following his arrest, Reyes-Soto decided to debrief with the government. According to Reyes-Soto, in approximately January 2021, Armando Serrano, who is Reyes-Soto's cousin, connected Reyes-Soto with Horacio HERNANDEZ-LAUREL (a/k/a "Lacho" or "Racho") (DOB: 01/01/1982) and Efrain HERNANDEZ-LAUREL (a/k/a "Neke") (DOB: 12/12/1978). According to Reyes-Soto, "Lacho" and "Neke" are brothers and members of a family from Papanoa, Mexico having a long history trafficking illegal drugs.  Reyes-Soto said he also attended school with "Lacho" in Mexico.  Both "Lacho" and "Neke" were from Monterrey, Mexico. "Lacho" and "Neke" trafficked their drugs from Monterrey, Mexico into the United States, and through transshipment points like Houston, Texas to various other destinations within the

8

continental United States. Reyes-Soto recalls initially speaking to both "Lacho" and "Neke" on speakerphone about the prospect of distributing kilogram-quantities of cocaine for them. Reyes-Soto would subsequently communicate with "Lacho" and "Neke" through WhatsApp about their cocaine-trafficking ventures. Unfortunately, Reyes-Soto did not preserve these communications.

15.     Investigators showed Reyes-Soto photographs of an individual suspected to be "Lacho." (see Figures 1 and 2). Reyes-Soto identified the person depicted in these photographs as "Lacho." Investigators determined that "Lacho" was Horacio HERNANDEZ-LAUREL based on a comparison of the person depicted in Figures 1 and 2 and images maintained in an immigration database. Reyes-Soto indicated "Lacho" does not enter the United States and instead orchestrates U.S.-bound cocaine loads from Monterrey, Mexico. According to TECS records, "Lacho" has not entered the United States since 2011. Investigators also showed Reyes-Soto a photograph of an individual suspected to be "Neke." (see Figure 3). Reyes-Soto identified the person depicted in this photograph as "Neke." On December 14, 2023, the Fayette County Sheriff's Office in Texas arrested an individual identified as "Efrain Guadalupe Hernandez Laurel" for "felony money laundering" following a traffic stop on I-10 westbound (the stretch between San Antonio and Houston) where a deputy seized $109,608.00 wrapped in five packages concealed in the jacket of the passenger and spouse of "Efrain Guadalupe Hernandez Laurel."[1] The deputy also discovered "suspicious packaging materials" inside an ice chest found in the vehicle. The person depicted in the Fayette County booking photograph for "Efrain Guadalupe Hernandez Laurel" (see Figure 4) is similar in appearance to the person depicted in Figure 3. Investigators also determined that "Neke" was Efrain HERNANDEZ-LAUREL based on a comparison of the person depicted in Figure 3 and images maintained in an immigration database.

---

[1] https://news4sanantonio.com/news/local/routine-traffic-stop-in-texas-leads-to-dramatic-capture-of-money-laundering-suspects-crime-people-local-jeep-la-grange-officers-police

9



Figure 1                              Figure 2



Figure 3              Figure 4

*"Neke" supplies 3 kilograms of cocaine – January/February 2021*

16.     In approximately January/February 2021, "Neke" offered to supply Reyes-Soto 5 kilograms of cocaine in San Antonio, Texas.  Reyes-Soto drove to San Antonio and contacted an unknown male (FNU LNU 1) whose phone number was provided by "Neke."  Once in San Antonio, Reyes-Soto called FNU LNU 1, who agreed to meet Reyes-Soto at a San Antonio mall. After meeting at the mall, Reyes-Soto and FNU LNU 1 proceeded to a residence where FNU LNU 1 gave Reyes-Soto three paint cans, which each held a kilogram of cocaine.  According to Reyes-Soto, the cocaine was smuggled through the port-of-entry located at Piedras Negras, Mexico and

10

Eagle Pass, Texas. Because the original arrangement contemplated 5 kilograms of cocaine, Reyes-Soto contacted "Neke" who told Reyes-Soto to simply take the 3 kilograms. Reyes-Soto concealed the cocaine in his vehicle and drove to Chicago where he temporarily stored the drugs at Ana Dominguez-Hernandez's residence. Reyes-Soto subsequently gave 2 kilograms to Rene Suarez, who gave them to a Chicago-based distributor named Lorenzo Patton. Reyes-Soto sold the remaining kilogram to an individual in South Bend, Indiana. Reyes-Soto had Ariel Rivas-Morales eventually transport the proceeds from the sale of the 3 kilograms to San Antonio, Texas. Rivas-Morales was supposed to return with kilograms of cocaine, but this did not happen. "Neke" was reluctant to supply additional kilograms of cocaine because he believed Reyes-Soto took too long to pay for the 3 kilograms.

*"Lacho" supplies 7 kilograms of cocaine – February/March 2021*

17.     "Lacho" was prepared to send Reyes-Soto up to 50 kilograms of cocaine that he could obtain from a source he met in Cancún, Mexico. After Reyes-Soto balked at receiving such a large quantity of cocaine, in approximately February/March 2021, "Lacho" instead directed Reyes-Soto to retrieve 7 kilograms at a garage in Elgin, Illinois. The cocaine belonged to a person nicknamed "El Tio," who was an older Monterrey, Mexico-based cocaine trafficker. "Lacho" worked for "El Tio." Reyes-Soto concealed the 7 kilograms in his vehicle and drove to Chicago where he temporarily stored the drugs at Dominguez-Hernandez's residence. He gave the cocaine to several individuals, including Suarez, who sold a kilogram to customers in Wisconsin. Reyes-Soto said it took 3-4 weeks to sell all 7 kilograms of cocaine. "Lacho" would use tractor-trailers to transport cocaine and the proceeds from the sale of cocaine. According to Reyes-Soto, Sergio Maldonado-Cardona, a truck driver, worked for "Lacho." On this occasion, Reyes-Soto gave the

proceeds from the sale of the 7 kilograms to Maldonado-Cardona for delivery to "Lacho" in Mexico.

*"Neke" supplies 4 kilograms of cocaine – April 2021*

18.     In approximately April 2021, "Neke" resumed supplying cocaine to Reyes-Soto. "Neke" had Maldonado-Cardona, who ordinarily worked for "Lacho," deliver 4 kilograms of cocaine to Reyes-Soto at a produce market in Chicago.[2]  "Lacho" permitted "Neke" to use Maldonado-Cardona's services.  "Neke" charged $36,000 per kilogram and had Reyes-Soto pay $1,000 per kilogram (i.e., $4,000) up front to cover Maldonado-Cardona's transportation costs. Reyes-Soto sold the 4 kilograms within three weeks at a $2,000 markup per kilogram (i.e., $38,000 per kilogram). Around this time, Reyes-Soto went to Los Angeles, California where he met "Neke" at a baptism celebration.  Reyes-Soto gave "Neke" $9,000, which was a portion of the proceeds from the sale of the 4 kilograms.  Reyes-Soto paid the remaining proceeds through an unknown woman (FNU LNU 2) who wired the funds to "Neke."  FNU LNU 2 charged a 10% commission, which upset "Neke" once he learned Maldonado-Cardona could transport money much cheaper. During the meeting in Los Angeles, "Neke" said he wanted to continue sending kilograms of cocaine to Reyes-Soto.  He suggested that Reyes-Soto invest his cocaine proceeds into purchasing additional quantities of cocaine.  "Neke" also offered to introduce Reyes-Soto to buyers in Chicago if Reyes-Soto did not have enough customers.  TECS records indicate that Efrain HERNANDEZ-LAUREL was in Los Angeles, California in late April 2021, which corroborates Reyes-Soto's account of a meeting with "Neke" in Los Angeles around April 2021.

---

[2] Although "Lacho" and "Neke" had distinct cocaine sources, they would share resources, e.g., personnel like Maldonado Cardona and their brother "Jesus," to further their illicit objectives.

*"Neke" supplies 5 kilograms of "tampered" cocaine – June 2021*
*"Jesus" confirms problem with cocaine*

19.     In approximately June 2021, Reyes-Soto received 5 kilograms of cocaine from "Neke."  Maldonado-Cardona delivered the cocaine to Reyes-Soto at the same produce market in Chicago as the previous load.  Reyes-Soto gave 3 kilograms to Suarez in Chicago, and 2 kilograms to a customer in Fort Wayne, Indiana.  The Fort Wayne customer opened a kilo-brick in Reyes-Soto's presence.  The brick bore a stamp that read "HH" and seemed incomplete (i.e., hollowed out).  The other cocaine bricks likewise seemed tampered.  When Reyes-Soto complained to "Neke" about this shipment, "Neke" initially did not believe him and pressured him to sell the cocaine.   After Reyes-Soto continued to complain, "Neke" relented and dispatched Jesus HERNANDEZ-LAUREL (a/k/a "Jesus"), his younger brother (and brother to "Lacho" as well), to Chicago to personally inspect the cocaine bricks to verify Reyes-Soto's story. Investigators presented a photograph of an individual suspected to be "Jesus." (<u>see</u> Figure 4).  Reyes-Soto identified the person depicted in this photograph as "Jesus."  The LinkedIn profile picture for "Jesús Hernández Laurel"[3] depicts an individual who is similar in appearance and has the same "anchor" neck tattoo as the person depicted in Figure 4.  Investigators also determined that "Jesus" was Jesus HERNANDEZ-LAUREL (DOB: 03/06/1991) based on a comparison of the person depicted in Figure 4 and images maintained in an immigration database.

---

[3] https://mx.linkedin.com/in/jes%C3%BAs-hern%C3%A1ndez-laurel-96968323a



| Figure 4 | Figure 5 |

20.     According to Reyes-Soto, he retrieved the 3 kilograms that he gave Suarez and met "Jesus" at a Chicago motel.  During the meeting, "Jesus" inspected the kilo-bricks and called "Neke" to confirm that there was indeed a problem with them.  "Jesus," however, did not take the tampered cocaine bricks with him.  Instead, Reyes-Soto gave "Jesus" $25,000, which were drug proceeds belonging to both "Lacho" and "Neke."  Reyes-Soto explained that "Jesus" only handled money for "Lacho" and "Neke" and was not directly involved with distributing cocaine.  Following the meeting at the hotel, Reyes-Soto helped "Jesus" collect money from other Chicago-based distributors.  Reyes-Soto estimated that "Jesus" collected just under $200,000 on this occasion. Reyes-Soto said "Jesus" collected these drug proceeds for both "Neke" and "Lacho."  At some point while Reyes-Soto was driving, he suspected that they were being followed.  Reyes-Soto subsequently dropped "Jesus" off near a McDonald's restaurant near S. Pulaski Road.  According to Reyes-Soto, "Jesus" departed with the cash, which he carried in a suitcase.  Reyes-Soto kept the 3 tampered bricks of cocaine.  "Neke" had Reyes-Soto return the 3 tampered kilograms – Reyes-Soto returned 1.5 kilograms to an unidentified Mexican male at a racecourse while Ana Dominquez-Hernandez returned 1.5 kilograms to "Neke" at a casino near O'Hare International

14

Airport. Reyes-Soto's Fort Wayne-based distributors were apparently able to distribute the two remaining tampered kilograms of cocaine.

21.     Investigators observed the meeting between Reyes-Soto and "Jesus." Specifically, on July 6, 2021, investigators observed Reyes-Soto and "Jesus" travel together to the Skylark Motel in Chicago, Illinois. (see Figures 6 and 7). Although investigators momentarily lost sight of Reyes-Soto and "Jesus," after an hour, investigators observed them emerge from Room 108 and depart the motel together in Reyes-Soto's vehicle. Investigators subsequently observed a ride-share service drop "Jesus" off at 2127 W. 71st Place, Chicago, Illinois. "Jesus" then unlocked the door of the residence and entered the premises. The person identified as "Jesus" had bleached-blonde hair. The Facebook account for "Jesús Laurel"[4] includes a May 2021 profile picture of a male with bleached-blonde hair (see Figure 8) who appears similar to the person depicted in Figures 4 and 5. This Facebook account also has several "selfie" images of "Jesús Laurel," who appears similar (including the distinctive "anchor" neck tattoo) to the person depicted in Figures 4 and 5. Investigators determined that Reyes-Soto used his Maryland driver's license to rent Room 108. (see Figure 9). Investigators also recovered indicia of drug trafficking from the room, i.e., black electrical tape, saran wrap, and heat-seal packaging, which is, based on your Affiant's training and experience, consistent with the materials typically used to package kilogram-quantities of cocaine. (see Figure 10).

---

[4] https://www.facebook.com/profile.php?id=100001022711149



Figure 6                                    Figure 7



Figure 8



Figure 9                                    Figure 10

16

*"Lacho" supplies 25 kilograms of cocaine – June 2021*

22.     Around the same time Reyes-Soto received the tampered 5 kilograms of cocaine from "Neke" (i.e., June 2021), he also received 25 kilograms of cocaine from "Lacho" – 10 kilograms were intended for Reyes-Soto while the other 15 kilograms were intended for a Mexican male (FNU LNU 3) who worked directly for "El Tio."  A truck driver, who was accompanied by his "brother," delivered the cocaine to Reyes-Soto at a truck stop along Highway 57 near Chicago. The "brother" handed Reyes-Soto two duffle bags that contained the 25 kilograms of cocaine.  The 10 kilograms intended for Reyes-Soto bore a "Spiderman" stamp and the other 15 kilograms had a clear wrapping.  Reyes-Soto gave the "brother" $15,000 as partial payment for his 10 kilograms. Reyes-Soto subsequently delivered the other 15 kilograms to FNU LNU 3 at a parking lot in Schaumburg, Illinois. FNU LNU 3 drove a Hyundai Elantra on this occasion. Reyes-Soto distributed his 10 kilograms to customers in both Illinois (Chicago area) and Indiana. After Rivas-Morales and Dominguez-Hernandez collected the drug proceeds, Reyes-Soto gave the money to Maldonado-Cardona for delivery to "Lacho."

*"Lacho" supplies 10 kilograms of cocaine – July/August 2021*

23.     "Lacho" subsequently supplied Reyes-Soto an additional 10 kilograms of cocaine. On this occasion, "Lacho" directed Reyes-Soto to retrieve the cocaine from FNU LNU 3.  FNU LNU 3, who was now driving a black Infiniti, gave Reyes-Soto the cocaine at a Holiday Inn next to Highway 90 near Schaumburg.  Reyes-Soto sold the 10 kilograms to his typical customers in Illinois and Indiana.  Rivas-Morales and Dominguez-Hernandez again collected the drug proceeds. During an intercepted communication on September 10, 2021, Reyes-Soto told Maldonado-Cardona that he had over $160,000 in drug proceeds ready for shipment.  According to Reyes-Soto, after Maldonado-Cardona retrieved the money, law enforcement stopped Maldonado-

17

Cardona on the highway and seized the money. On September 10, 2021, Will County, Illinois Sheriff's deputies (at the request of investigators) stopped Maldonado-Cardona on Interstate 55. The deputies found two bundles, wrapped with black electrical tape, concealed in the air intake/ventilation of Maldonado-Cardona's truck. The two bundles contained $166,090 in U.S. currency. Reyes-Soto confirmed that this money was proceeds from the sale of the second 10 kilograms of cocaine supplied by "Lacho." According to Reyes-Soto, "Lacho" suspected that either Reyes-Soto or Maldonado-Cardona had stolen the money. Reyes-Soto paid Suarez's attorney $5,000 to obtain the paperwork confirming that the money was indeed seized by law enforcement. Although Reyes-Soto sent "Lacho" this paperwork, "Lacho" remained suspicious.

*Houston trailer home serves as "stash" location*

24.     Except for the first 3 kilograms of cocaine that "Neke" supplied Reyes-Soto, the HERNANDEZ-LAUREL brothers would temporarily store their subsequent cocaine loads in Houston, Texas before delivery to Reyes-Soto in Chicago. Specifically, a female nicknamed "Culichi" would store the cocaine at her trailer home near Houston, Texas before releasing it for further distribution. "Culichi" was paid between $200-$300 per kilogram of cocaine stored at her trailer. "Culichi" stored cocaine intended for both Reyes-Soto and others. Once the cocaine was smuggled across the border, "Lacho" would notify "Culichi" of the inbound shipment and instruct her as to whom she should release the cocaine. Reyes-Soto was in regular contact with "Culichi." For instance, when "Lacho" sent the 25 kilograms of cocaine to Reyes-Soto in June 2021, "Culichi" sent Reyes-Soto an image of the bricks bearing the "Spiderman" stamp that had been stored at her trailer. "Culichi" also told Reyes-Soto that "El Tio" had died from COVID and that "Lacho" had taken "El Tio's" place in the organization.

18

*"Neke" arrested for "money laundering" in Fayette County, Texas*

25.     On December 14, 2023, at about 9:23 am, Fayette County Sheriff's Office Deputy David Smith stopped a 2015 Jeep Cherokee, bearing Mexican license plates, on I-10 westbound in Fayette County, Texas (between Houston, Texas and San Antonio, Texas) for traffic violations. The occupants of the Jeep included Efrain HERNANDEZ-LAUREL (DOB: 12/12/1978), who was the driver; Adriana Perez-Valencia (DOB: 10/07/89), who was Hernandez-Laurel's spouse; and their minor child.  During the traffic stop, HERNANDEZ-LAUREL initially indicated that he only had $1,000 and that he was returning from Houston after a one-day trip.  HERNANDEZ-LAUREL said he was en route to San Marcos, Texas to shop at an outlet mall.  HERNANDEZ-LAUREL gave Deputy Smith consent to search the Jeep.  During the search of the vehicle, Deputy Smith found a cooler that contained Saran wrap and black electrical tape, which is, based on your Affiant's training and experience, consistent with the materials typically used to package kilogram-quantities of cocaine.  The packaging materials were found underneath food items inside the cooler.  After Deputy Smith had Perez-Valencia exit the Jeep, he noticed that she was wearing a jacket and blanket and was awkwardly moving.  Deputy Smith searched Perez-Valencia and found five (5) bundled packages on her person.  The packages contained $107,530 in U.S. currency. Deputy Smith recovered an additional $2,078 from both HERNANDEZ-LAUREL said he was paid $2,000 to transport the $107,530, which he obtained from an unknown male in Houston, Texas.  HERNANDEZ-LAUREL said he packaged the money and concealed in on his wife for transportation.   Based on training and experience, your Affiant knows that drug-trafficking organizations often conceal contraband and/or drug proceeds on individuals during smuggling ventures. HERNANDEZ-LAUREL claimed the $107,530 did not belong to him.

19

26.     In video from Deputy Smith's body camera, HERNANDEZ-LAUREL is visibly holding a smartphone with a blue protective case. (see Figure 11). Incident to HERNANDEZ-LAUREL's arrest, Deputy Smith seized a black Samsung smartphone with a blue protective case and assigned International Mobile Equipment Identity (IMEI) number 351980931002883 (the **TARGET CELLPHONE**).



Figure 11

27.     Based on the above-referenced evidence, on January 17, 2023, a Federal Grand Jury in the Eastern District of Wisconsin returned a **sealed** three-count indictment against Horacio HERNANDEZ-LAUREL (a/k/a "Lacho," "Racho"), Efrain HERNANDEZ-LAUREL (a/k/a "Neke), and Jesus HERNANDEZ-LAUREL alleging Conspiracy to Distribute 5 Kilograms or More of Cocaine, a Schedule II Controlled Substance, Intending, Knowing, and Having Reasonable Cause to Believe that Such Controlled Substance Would be Unlawfully Imported into the United States (Count One), in violation of 21 U.S.C. §§ 963, 959(a), and 960(b)(1)(B); Conspiracy to Possess with Intent to Distribute 5 Kilograms or More of Cocaine (Count Two), in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); and Conspiracy to Launder Monetary Instruments (Count Three), in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A).

28.     Based upon information obtained during the investigation of the underlying offenses, your Affiant knows HERNANDEZ-LAUREL would routinely use a cellular telephone

20

to communicate with others regarding drug-trafficking activity. Furthermore, based upon my training and experience, it is known that individuals who smuggle drugs and drug proceeds frequently use cellular telephones to maintain contact with their associates during travel and also use cellular telephones to contact persons where the drugs and drug proceeds are destined. This frequently occurs due to the transient nature of these smuggling operations and because members of these conspiracies frequently travel and require coordination of their movements to pick up and drop off drugs and drug proceeds at designated times and places.

29.     North Central HIDTA investigators requested the Fayette County Sheriff's Office send the **TARGET CELLPHONE** to North Central HIDTA so that investigators could obtain a warrant to conduct a forensic examination of the **TARGET CELLPHONE**. On February 8, 2024, North Central HIDTA received the **TARGET CELLPHONE**, which is currently located at 11548 Theo Trecker Way, West Allis, WI 53214.

30.     In my training and experience, I know that the **TARGET CELLPHONE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET CELLPHONE** first came into the possession of North Central HIDTA investigators.

## TECHNICAL TERMS

31.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.

22

This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include

23

various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

24

h.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

32.   Based on my training, experience, and research, I know that the **TARGET CELLPHONE** has capability that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

34.   There is probable cause to believe that things that were once stored on the **TARGET CELLPHONE** may still be stored there, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a

25

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET CELLPHONE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET CELLPHONE** because:

26

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

27

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET CELLPHONE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

38. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET CELLPHONE** described in Attachment A to seek the items described in Attachment B.

28

The property to be searched, identified as "**TARGET CELLPHONE**," is described as follows: a black Samsung smartphone with a blue protective case and assigned International Mobile Equipment Identity (IMEI) number 351980931002883. (see images of device below)







The **TARGET CELLPHONE** is currently located at 11548 Theo Trecker Way, West Allis, WI 53214. This warrant authorizes the forensic examination of the **TARGET**

**TELEPHONE** for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.     All records on the **TARGET CELLPHONE** described in Attachment A that relate to violations of Title 21, United States Code, Sections 963, 959(a), and 960(b)(1)(B) (international drug-trafficking conspiracy); Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A) (conspiracy to possess with intent to distribute controlled substances); and Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A) (money-laundering conspiracy), including, but not limited to:

      a.   contact lists;

      b.   any information regarding schedules or travel;

      c.   all bank records, checks, credit card bills, account information, and other financial records;

      d.   photographs and/or video depicting Efrain HERNANDEZ-LAUREL and/or others who may have engaged in violations of the above-referenced offenses;

      e.   electronic telephone books, address books, telephone bills, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications (e.g., text messages, iMessages, etc.) regarding violations of the above-referenced offenses among and between Efrain HERNANDEZ-LAUREL and/or others who may have engaged in violations of the above-referenced offenses; and

      f.   records of Internet Protocol (IP) addresses used; records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or

31

"favorite" web pages, search terms that the user entered into any internet search engine, and records of user typed web addresses.

2. Evidence of user attribution showing who used or owned the **TARGET CELLPHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.